# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

February 20, 2020

Lyle W. Cayce
Clerk

No. 18-60081

ELEANOR KELLER, individually and on behalf of all Heirs-at-Law and/or
wrongful death beneficiaries of Gerald Simpson, Deceased; THE ESTATE OF
GERALD SIMPSON, by and through Glen Simpson, Administrator of Estate,

Plaintiffs - Appellees

v.

DARRIN FLEMING,

Defendant - Appellant

Appeal from the United States District Court
Northern District of Mississippi

Before STEWART, DENNIS, and WILLETT, Circuit Judges.

CARL E. STEWART, Circuit Judge:

The original opinion was filed on July 23, 2019 and later WITHDRAWN.
*Keller v. Fleming*, 930 F.3d 746 (5th Cir. 2019). We substitute the following:

Following decedent Gerald Simpson's death in which a motorist struck
and killed him, Plaintiffs[1] filed suit against, *inter alia*, Deputy Darrin Fleming
of the Attala County Sheriff's Department, alleging Fourth and Fourteenth
Amendment violations. Fleming filed a motion for summary judgment

---

[1] Plaintiffs are Simpson's estate and Eleanor Keller (Simpson's sister), individually
and on behalf of other members of Simpson's family.

No. 18-60081

asserting a qualified immunity defense on each claim.  The district court denied the motion, and Fleming timely filed an interlocutory appeal. Concluding that the district court erred in denying qualified immunity as to both the Fourth and Fourteenth Amendment claims, we REVERSE and RENDER judgment in Deputy Fleming's favor.

## I.

On January 26, 2015, Gerald Simpson, a mentally infirmed man, was walking in the middle of Highway 12 in Kosciusko, Mississippi.[2]  Around 5:00 p.m., an individual witnessed Simpson walking and contacted the authorities. The Kosciusko Police Department responded to the dispatch call.  Officer Steve Allan arrived and stopped Simpson and "asked [him] to step out of the highway."[3]  He determined that Simpson was outside the city limits and within Attala County's jurisdiction so he alerted the Attala County Sheriff's Department.  Waiting for Attala County law enforcement to arrive, Officer Allan attempted to question Simpson, but he was unable to understand Simpson due to his incoherent speech.  Simpson continuously pointed westward down the highway.

Kosciusko Police Officer Maurice Hawthorne arrived and replaced Officer Allan, who left to respond to another call.  Simpson then began to resume his walk down the highway.  "Officer Hawthorne followed him in his

---

[2] Our interlocutory review is based on the facts the district court accepted as sufficient to deny summary judgment which are stated in *Keller v. Attala County*, No. 1:16-cv-136-SA-DAS, 2018 WL 615681, at *1 (N.D. Miss. Jan. 29, 2018); *cf. Cantrell v. City of Murphy*, 666 F.3d 911, 922 (5th Cir. 2012) ("When considering an appeal from the denial of qualified immunity . . . our inquiry concerns the purely legal question of whether the defendants are entitled to qualified immunity on the facts that the district court found sufficiently supported in the summary judgment record.").

[3] *Keller*, 2018 WL 615681, at *1.

No. 18-60081

patrol vehicle until he was able to convince Simpson to sit in the backseat of his vehicle."[4]  Simpson sat with his feet on the ground with the door still open.

Deputy Fleming of Attala County arrived on the scene, "at which point the officers purportedly decided to take Simpson to his residence, though both officers acknowledge that Simpson was still incoherent."[5]  Deputy Fleming put Simpson in the back seat of his vehicle and asked Simpson where he resided. He was unable to articulate the location of his residence and instead pointed west on Highway 12, in the direction of Durant, Mississippi.  Deputy Fleming did not ask for Simpson's exact address or identification card.  Based on Simpson pointing west, Deputy Fleming transported Simpson in that direction until he reached the Attala County line which was sometime after 5:00 p.m. Deputy Fleming then pulled over, opened the back door of his patrol vehicle, Simpson exited the vehicle, and Simpson continued walking toward Durant on County Road 4101, outside of Attala County's jurisdiction.  "Deputy Fleming testified that there was barely enough daylight to see someone walking, but that it was not dark yet."[6]  Later that night[7], Simpson was struck by a vehicle and killed as he "was walking east, back toward Kosciusko."[8]

Plaintiffs filed this wrongful death action against City of Kosciusko, Officers Allan and Hawthorne, Attala County, and Deputy Fleming.  They alleged, pursuant to 42 U.S.C. § 1983, that the officers' actions violated Simpson's constitutional rights under the Fourth Amendment for wrongful seizure and the substantive due process clause of the Fourteenth Amendment. The district court granted summary judgment in favor of the City of Kosciusko

---

[4] *Id.*

[5] *Id.*

[6] *Id.*

[7] The operative complaint alleges that it was approximately 8:00 p.m.

[8] *Id.*

No. 18-60081

and Officers Allan and Hawthorne.[9]  As to Attala County and Deputy Fleming, the court granted only partial summary judgment, finding that genuine issues of material fact existed as to Plaintiffs' constitutional claims.  Deputy Fleming appealed.[10]

## II.

An interlocutory order denying qualified immunity is immediately appealable "to the extent that it turns on an issue of law."  *Gobert v. Caldwell*, 463 F.3d 339, 344 (5th Cir. 2006) (internal quotation marks and citation omitted).  Our jurisdiction over such an appeal is limited.  *See id.*  We must accept the plaintiff's version of events as true, and we may review de novo "only whether the district court erred in assessing the legal significance of the conduct that [it] deemed sufficiently supported for purposes of summary judgment."  *Kinney v. Weaver*, 367 F.3d 337, 348 (5th Cir. 2004) (en banc); *Juarez v. Aguilar*, 666 F.3d 325, 331–32 (5th Cir. 2011) ("Where factual disputes exist in an interlocutory appeal asserting qualified immunity, we accept the plaintiff's version of the facts as true." (quoting *Kinney*, 367 F.3d at 348) (cleaned up)).  "[We also] must view the evidence 'in the light most favorable to the opposing party'"—here, Plaintiffs.  *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

In turn, we accept the district court's determination that genuine "questions of material fact" existed as to whether "Deputy Fleming acted on a custom of picking up those viewed as vagrants and dropping them off in

---

[9] Plaintiffs' claims against Kosciusko officers are not the subject of this interlocutory appeal.  *Keller*, 2018 WL 615681, at *8–9.

[10] The district court granted a stay pending this appeal because "the disposition of claims against the County are significantly intertwined with the pending resolution of [this appeal]."  Order, *Keller v. Fleming*, No. No. 1:16-CV-136-SA-DAS (N.D. Miss. May 2, 2018), ECF No. 103.

No. 18-60081

neighboring jurisdictions so as to rid Attala County of the problem." *Keller v. Attala County*, No. 1:16-cv-136-SA-DAS, 2018 WL 615681, at *5 (N.D. Miss. Jan. 29, 2018).[11]

If assuming the version of the disputed events (most favorably to the plaintiff) still does not give rise to a violation of clearly established law, then reversal is appropriate. *Kinney*, 367 F.3d at 347–48.

### III.

Plaintiffs bear the burden to rebut Deputy Fleming's qualified immunity defense and demonstrate that there were Fourth and Fourteenth Amendment rights that were clearly established at the time of the constitutional violation. *See, e.g.*, *King v. Handorf*, 821 F.3d 650, 653–54 (5th Cir. 2016) (noting that a "good-faith assertion of qualified immunity alters the usual summary judgment burden of proof") (quoting *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016)).

In evaluating the qualified immunity defense, the familiar two-step analysis controlling our review is whether (1) "'the facts alleged show the officer's conduct violated a constitutional right'; and [(2)], 'whether the right

---

[11] While we accept the district court's determination as to the genuineness of this vagrant policy, we do so because we adhere to the interlocutory standard for qualified immunity. *See Wagner v. Bay City*, 227 F.3d 316, 320 (5th Cir. 2000) (stating that on an interlocutory appeal for qualified immunity, we can review the materiality of any factual disputes, but not their genuineness).

It is important to note that upon review of the second amended complaint, and the parties' appellate and district court summary judgment briefing, there are several inconsistencies in what the parties presented to the district court and what the court recognized in its summary judgment order, mainly this anti-vagrant policy theory. Indeed, the operative complaint does not state such a theory, and there is no evidence in support thereof. At summary judgment, Plaintiffs argued that the Attala County policy is that "it is customary for law enforcement officers to give courtesy rides and not to travel beyond their designated jurisdiction"—which the court recognized in its summary judgment order. However, a courtesy ride policy in no way implicates a policy to transport vagrants to neighboring jurisdictions for the purpose of ridding a county of vagrants.

was clearly established.'" *Trammell v. Fruge*, 868 F.3d 332, 339 (5th Cir. 2017) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  We review the district court's resolution of these legal issues—the scope of clearly established law and the objective reasonableness of the defendant government officials' actions— de novo.  *See Rockwell v. Brown*, 664 F.3d 985, 991 (5th Cir. 2011); *see also Lytle v. Bexar County*, 560 F.3d 404, 409 (5th Cir. 2009).  We have discretion to address either prong of the qualified immunity inquiry first.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (noting that "two-step procedure promotes the development of constitutional precedent and is especially valuable for questions that do not frequently arise in cases in which a qualified immunity defense is unavailable").

We first "answer the constitutional violation question by determining whether the officer's conduct met the Fourth Amendment's reasonableness requirement."  *See Lytle*, 560 F.3d at 410.

<u>Fourth Amendment</u>

Plaintiffs' wrongful seizure claim implicates the Fourth Amendment's prohibition on unreasonable seizures as the basis for a constitutional violation. U.S. CONST. amend. IV.

Our Fourth Amendment de novo analysis begins with whether Simpson was seized, and assuming a seizure has occurred, we then evaluate the seizure's reasonableness and the clearly established law prong.  *McLin v. Ard.*, 866 F.3d 682, 691 (5th Cir. 2017) (reviewing whether a seizure occurred under the qualified immunity framework de novo); *United States v. Cooper*, 949 F.2d 737, 744 (5th Cir. 1991) (stating that "the ultimate question of the legality of the . . . seizure is a question of law alone [that this court must answer]" subject to a de novo review).

No. 18-60081

*Seizure.* The district court determined that Simpson was seized.[12]

Fleming's position is that the district court erroneously considered his subjective intentions of his encounter with Simpson, rather than applying an objectively reasonable standard. Irrespective of the court questioning Fleming's motive during these events, Fleming is silent on the issue of seizure.[13] Plaintiffs, on the other hand, contend that Fleming improperly seized Simpson in placing Simpson in the back of his patrol vehicle and not allowing him to exit the car without Fleming's authority or assistance. While Fleming is correct that the court analyzes seizure using an objectively reasonable test, it is Plaintiffs who are ultimately correct.

Under the Fourth Amendment, a seizure occurs when, under the totality of the circumstances, a reasonable person would have thought he was not free to leave. *Michigan v. Chesternut*, 486 U.S. 567, 572 (1988) (citation omitted). "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has seized that person." *Terry v. Ohio,* 392 U.S. 1, 16 (1968) (internal quotations omitted).

Assuming the district court's version of the events to be true, Simpson's freedom of movement was restrained and a reasonable person in Simpson's position would not have felt free to leave. The officers' collective supervision

---

[12] While not expressly stated, the district court clearly infers that Simpson was seized. *Keller*, 2018 WL 615681, at *6. We can draw this inference from the district court's reasonableness holding that the (1) "jury must resolve whether Deputy Fleming was fulfilling his role as a community caretaker and whether that role eventually fell away, leaving only an *improper seizure to remain*"; and (2) "Plaintiff's Fourth Amendment claim is viable, because it is questionable whether Simpson was *improperly seized*—whether Deputy Fleming was acting as a community caretaker, whether Simpson ever felt as though he was free to leave, and whether he was capable of giving his consent to be seized in the first place." *Id.* (emphasis added). Said differently, the district court found that absent a warrant exception or justification (*e.g.*, the community caretaker exception), the jury question was whether Simpson's seizure was unreasonable or improper, not whether Simpson was seized. *Id.*

[13] Of note, Deputy Fleming's appellate brief provides a legal standard for seizure, but he otherwise presents no arguments as to whether Simpson was seized.

and actions support this finding.   Here, when Simpson tried to walk down the highway again[14], Officer Hawthorne followed him in his patrol car until he had to pull off because there was "no room."[15]   Once the vehicle was pulled off to the side, Officer Hawthorne persuaded Simpson to stop and sit in the backseat of his patrol car.   In other words, Officer Hawthorne interrupted Simpson's path and "intercept[ed] him to prevent his progress"—which is "probably decisive" in assessing seizure.  *United States v. Berry*, 670 F.2d 583, 597 (5th Cir. 1982) (blocking defendant's path at an airport constituted a seizure) (citation omitted).   This is likely when the seizure began, and it likely did not end until Simpson was dropped off because as the district court stated, "Fleming [subsequently] put Simpson in the backseat of his vehicle" and drove for several miles, and finally just "pulled over and opened the door of his patrol vehicle" when he reached the county line.  *Keller*, 2018 WL 615681, at *1.  This is an example of a show of authority restraining Simpson's freedom to leave, triggering the Fourth Amendment.  *Florida v. Bostick*, 501 U.S. 429, 434 (1991). ("The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature . . . 'Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.'") (quoting *Terry*, 392 U.S. at 16 n.16).

Consequently, we affirm the district court's seizure finding.

---

[14] We acknowledge that Officer Hawthorne's initial stop of Simpson did not initiate the seizure because "[o]ur cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991).  But it is his actions thereafter that triggered the Fourth Amendment.

[15] In his deposition, Officer Hawthorne states "I shadowed him onto Sand Road; pulled off on Sand Road to where it was a road where I could pull off at, because there wasn't no room . . . And asked Mr. Simpson would he like to sit down. And he sat down in the back of my patrol car."

No. 18-60081

*Unreasonableness.* We now determine whether this seizure was reasonable under the Fourth Amendment.

Absent probable cause, warrantless searches and seizures are presumptively invalid or "*per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967); *compare with United States v. Morris*, 477 F.2d 657, 663 (5th Cir. 1973) ("A warrantless arrest is nevertheless valid if the arresting officer has probable cause to believe that the person arrested has committed or is in the act of committing a crime."). As such, Deputy Fleming now bears the burden in proving that the seizure of question was either supported by probable cause or falls within one of the few well-delineated exceptions to the warrant requirement. *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993) ("While in general . . . the defendant has the burden of proving . . . that the material in question was seized in violation of his constitutional rights, there are several situations where the burden shifts to the government.") (citation omitted).

Here, Deputy Fleming's appellate brief is unclear as to what warrant exceptions justified the seizure of Simpson.[16] Fleming does not contend that

---

[16] The district court opinion construes Deputy Fleming's courtesy ride statements as a basis for excepting the Fourth Amendment under the community caretaker doctrine and consent warrant exception. *Keller*, 2018 WL 615681, at *7–8. As to the former, our circuit has yet to explicitly extend this community caretaker doctrine to unlawful detentions, but we have suggested in *dicta* that such seizures may be reasonable. *See United States v. Rideau*, 969 F.2d 1572 (5th Cir. 1992) (en banc). Moreover, a majority of our sister circuits refer to this doctrine as a warrant exception, but we recognize that this doctrine has also been considered as a stand-alone justification. *Taylor v. City of Signaw*, 922 F.3d 328, 334–35 (6th Cir. 2019) (referring to community caretaker doctrine as an exception to warrant requirement); *United States v. Parks*, 902 F.3d 805, 812–13 (8th Cir. 2018) ("One such exception [to the warrant requirement] applies when police officers engage in a community caretaking function.") (quotation omitted); *Vargas v. City of Phila.*, 783 F.3d 962, 971 (3rd Cir. 2015) ("That community caretaking doctrine . . . is an exception to the warrant requirement of the Fourth Amendment."); *MacDonald v. Town of Eastham*, 745 F.3d 8, 13 (1st Cir. 2014) (same); *compare with United States v. Gemma*, 818 F.3d 23, 32 (1st Cir. 2016)

he had probable cause to believe that Simpson was guilty of criminal activity nor does he state that he had a reasonable suspicion of such criminal activity. He continues to rely on his subjective mindset. He also maintains that he was only giving Simpson a courtesy ride and his brief states that "Attala County Sheriff's Department has a history of offering to give pedestrians courtesy rides if there is a need for it or for their own safety."[17] But he goes no further into how this policy or this specific courtesy ride fits within the prism of our well-delineated warrant exceptions. Therefore, Deputy Fleming did not satisfy his burden in justifying this stop because any argument to that effect was forfeited. *See Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) ("A party who inadequately briefs an issue is considered to have abandoned the claim.").

---

(ruling that evidence was admissible because evidence was retrieved in the course of the officer's community caretaker duties).

[17] Of note, there are arguments that can be made with regard to the community caretaker function and consent. As to the community caretaker doctrine, Deputy Fleming could arguably have advanced the public interest because Simpson posed an imminent threat to himself or oncoming traffic. *Cf. Rideau*, 969 F.2d at 1574 ("Police have long served the public welfare by removing intoxicated people from the public streets, where they pose a hazard to themselves and others."' (citing *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973))); *Meehan v. Thompson*, 763 F.3d 936, 941 (8th Cir. 2014) ("We have recognized that it may be reasonable under the Fourth Amendment for a police officer, acting in his capacity as community caretaker, to seize an apparently intoxicated individual to ensure the safety of the public and/or the individual.") (internal quotation marks and citations omitted). On the flipside, even if Officer Fleming arrived at the scene as a "community caretaker," a material fact question remains as to whether the procedures he employed (pursuant to that function) were reasonable under the Fourth Amendment. Indeed, community caretaking stops must be both reasonable in their inception and reasonable as conducted. *Cf. United States v. King*, 990 F.2d 1552, 1562 (10th Cir. 1993) (stating that a detention must be justified at its inception and as it proceeds). The same can be said with regard to arguments for and against consent.

But, as mentioned, none of these positions are before us on appeal and are therefore forfeited. *See Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994); *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence [and arguments] to support a party's opposition to summary judgment.").

No. 18-60081

Accordingly, without a valid exception to the probable cause requirement, the seizure is therefore presumptively unreasonable, and a constitutional violation is present.

*Clearly Established Law.* Plaintiffs must still demonstrate that there was a clearly established right at the time of the challenged actions. Thus, the question becomes whether there is precedent that put Deputy Fleming on notice that he was committing a constitutional violation when he drove Simpson several miles to the county line and dropped him off.

For purposes of determining whether the right was clearly established, "[t]he relevant question . . . is . . . whether a reasonable officer could have believed [his or her conduct] to be lawful, in light of clearly established law and the information the . . . officers possessed." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). In other words, Plaintiffs must point this court to a legislative directive or case precedent that is sufficiently clear such that every reasonable official would have understood that what he is doing violates that law. *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

Here, Plaintiffs' burden is not met. Plaintiffs' clearly established law contentions in their briefing are in fact a narrative as to why Deputy Fleming's seizure was unreasonable. Plaintiffs' narrative argument is of no import of a pre-existing or precedential case. *Kovacic v. Villarreal*, 628 F.3d 209, 214 (5th Cir. 2010) ("Plaintiffs have not referenced a single case in either the district courts or the court of appeals of this circuit in which state actors were held liable for private harm caused to an individual after he was released from custody."). In turn, there is no binding Supreme Court or Fifth Circuit precedent to anchor our de novo review of whether a similarly situated officer violated a constitutional right acting under similar circumstances. *See White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) ("[F]or a right to be clearly

established, 'existing precedent must have placed the statutory or constitutional question beyond debate.'") (quoting *Mullenix v. Luna,* 136 S. Ct. 305, 308 (2015)).  Without setting forth a clearly established right for which the analysis can continue, Plaintiffs have not defeated Deputy Fleming's qualified immunity defense.  *Cass,* 814 F.3d at 732–33 (granting qualified immunity because plaintiffs failed to show an existing precedent of the constitutional violation).

Of note, the dissent cites to *Hope v. Pelzer* for the proposition that "general statements of the law are not inherently incapable of giving fair and clear warning" and "general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question."  536 U.S. 730, 741 (2002).  The dissent argues that Deputy Fleming was on clear notice that the reasonableness of the seizure of Simpson would be subject to a Fourth Amendment balancing test (weighing individual intrusion against legitimate government interests).  Weighing the cognizable interests of Simpson against the government interests here, the dissent's position is that the scale tips starkly in Plaintiff's favor in light of *Papachristou v. City of Jacksonville*'s holding that "anti-vagrancy" laws are void for vagueness as they permit "unfettered discretion" in seizing an individual like Simpson.  405 U.S. 156, 171 (1972).

Assuming that general statements (under *Hope*) may suffice, the balance of interests here are not so lopsided.  As stated herein and by the district court, there is an argument for the community caretaker function (for example) which would be a legitimate government interest as to public safety.  *See, supra,* Sect.III n.17 (collecting cases); *see also Keller,* 2018 WL 615681, at *5 ("[T]he initial interaction between Simpson and Deputy Fleming may have been reasonable, given the fact that Simpson possibly posed a danger to himself and the community by standing in oncoming traffic.").  Because there are legitimate

No. 18-60081

interests on both sides, this is not a one-sided balancing test where the officer "do[es] not have any relevant, legitimate interests to put on their side of the[] scales." *Kinney*, 367 F.3d at 372; *cf.* Sect.III n.17.[18]

Accordingly, Deputy Fleming's qualified immunity defense as to Plaintiffs' Fourth Amendment claim prevails because Plaintiffs failed to prove that a reasonable officer like Fleming would have understood his actions violated clearly established law. Judgment is therefore rendered in Deputy Fleming's favor as he is entitled to qualified immunity on this claim.

### Fourteenth Amendment

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. AMEND. XIV, § 1.

Plaintiffs submit that Deputy Fleming's conduct created the "special relationship" under *DeShaney v. Winnebago County Department of Social Services* and a "state-created-danger" resulted thereof. 489 U.S. 189, 199−200 (1989). The district court held that Fleming was not entitled to qualified immunity under this claim because, *inter alia*, there were genuine issues of material fact as to whether there was a "special relationship" between Fleming and Simpson that deprived Simpson of his liberty. Deputy Fleming argues that the law does not clearly establish that a special relationship would have existed under the facts of this case. We agree with Fleming because even if a "special relationship" existed, Plaintiffs must show that Simpson's Fourteenth Amendment right was clearly established at the time of the alleged violation.

The Supreme Court has "repeatedly told courts not to define clearly established law at a high level of generality." *Mullenix*, 136 S. Ct. at 308

---

[18] In other words, denying qualified immunity under the dissent's framework appears to be inappropriate because a "real balancing" of interests would be required here. *Cf. Kinney*, 367 F.3d at 372.

(quotation omitted) (cleaned up).  Again, the dispositive question is "whether the violative nature of particular conduct is clearly established." *Id.*

Here, while Simpson was killed by a motorist after Fleming dropped him off at the county line, the High Court in *DeShaney* held that states and their officials have no affirmative duty to protect individuals from violence by private actors.[19]  489 U.S. at 197.  The Court explained

> That the State once took temporary custody of [the child] does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter.

*Id.*  Some courts have interpreted this language in *Deshaney* as creating a second exception to "the rule against state liability for violence committed by private actors in situations where the state actor played an affirmative role in creating or exacerbating a dangerous situation that led to the individual's injury." *See Kovacic*, 628 F.3d at 214 (discussing *Davis v. Brady*, 143 F.3d 1021 (6th Cir. 1998) (holding that officers violated a man's substantive due process rights by placing him at risk of harm when they abandoned him in an inebriated condition on an unfamiliar highway against his will)) (internal quotations omitted).  But the Fifth Circuit has never recognized this "state-created-danger" exception.  *See id.* (concluding that the law did not clearly establish state actors could be liable for private harm to an individual after his release from custody).

---

[19] It is worthy to note that the Supreme Court in *DeShaney* also recognized that, in limited circumstances, the State's actions in taking a person into custody and holding him there against his will creates a "special relationship," *id.* at 199–200, such as the relationship between State and prisoners, *Estelle v. Gamble,* 429 U.S. 97, 103–04 (1976), involuntarily committed mental patients, *Youngberg v. Romeo,* 457 U.S. 307, 315–16 (1982), and suspected criminals injured while being apprehended by police, *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).

No. 18-60081

Plaintiffs therefore have not demonstrated a clearly established substantive due process right on the facts they allege. Accordingly, we reverse the district court's denial of summary judgment and render judgment that Deputy Fleming is entitled to qualified immunity on Plaintiffs' Fourteenth Amendment claim.

IV.

For these reasons, we REVERSE the district court's judgment denying Deputy Fleming qualified immunity and RENDER judgment granting him qualified immunity from Plaintiffs' Fourth Amendment and Fourteenth Amendment claims.

No. 18-60081

JAMES L. DENNIS, Circuit Judge, dissenting in part.

The district court found that it was genuinely disputed whether Darrin Fleming picked up and transported Gerald Simpson out of the county pursuant to a local unwritten custom of ousting those perceived as vagrants from the jurisdiction, and we must accept these facts as true at this juncture. *See Cantrell v. City of Murphy*, 666 F.3d 911, 922 (5th Cir. 2012) ("When considering an appeal from the denial of qualified immunity . . . our inquiry concerns the purely legal question of whether the defendants are entitled to qualified immunity on the facts that the district court found sufficiently supported in the summary judgment record."). I agree with the majority that, under these facts, Fleming violated Simpson's Fourth Amendment rights. I disagree, however, that Plaintiffs failed to demonstrate that these rights were clearly established.

The district court found that, "[i]n taking Plaintiffs' allegations as true, that [Fleming] wanted to remove Simpson from [his] jurisdiction as a means to rid [Attala County] of a vagrancy problem, it cannot be said that Deputy Fleming did not understand that what he was doing violated the law." The majority holds that this was error because Plaintiffs have failed to demonstrate that the Fourth Amendment rights that Fleming violated were clearly established at the time of the incident. But qualified immunity works only "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier*, 533 U.S. 194, 206 (2001). Under this framework, a right may be clearly established even without on-point precedent where a defendant's conduct clearly and obviously violates the Constitution. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002). The "salient question" is not whether there are previous cases with facts that are "fundamentally similar," but rather, "whether the state of the law [at the time of defendants' conduct] gave [them] fair warning that [plaintiff's] alleged treatment was unconstitutional." *Id.*

16

No. 18-60081

At the time the incident at issue here occurred, Supreme Court precedent provided clear notice that "the reasonableness of a seizure under the Fourth Amendment is determined by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate government interests." *Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cty.*, 542 U.S. 177, 187 (2004) (internal quotations omitted). When the question of whether a constitutional violation occurred depends on this sort of balancing of interests, qualified immunity should not apply when, "given the factual disputes identified by the district court and taking the plaintiffs' side of those disputes, [a] case does not require any real balancing at all" because the officers "do not have any relevant, legitimate interests to put on their side of the[] scales." *Kinney*, 367 F.3d at 372. "Our cases show that it is entirely appropriate to deny qualified immunity when the balance of cognizable interests weighs so starkly in the plaintiff's favor" because "the illegality of the Police Official['s] conduct is sufficiently clear that [he] can fairly be said to have been on notice of the impropriety of [his] actions." *Id.*

Accepting the facts that the district court found to be genuinely disputed, there is simply no legitimate government interest against which to balance the significant intrusion posed by Deputy Fleming's decision to seize Simpson and dump him in the next jurisdiction without his valid consent. The Supreme Court has long made clear that the Constitution does not permit police to "roundup . . . so-called undesirables" merely because they are "poor people, nonconformists, dissenters, idlers." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 171 (1972). With a balance so one-sidedly contrary to an individual's Fourth Amendment rights, every reasonable officer would have understood that seizing Simpson under these circumstances was arbitrary and unreasonable. *See Hope*, 536 U.S. at 741.

17

Further, precedent from the Supreme Court provided notice when these events occurred that a law that provides officers with "unfettered discretion" to arrest persons as vagrants merely on suspicion of future criminality is impermissibly vague. *See Papachristou*, 405 U.S. at 163, 168 (invalidating a vagrancy law that criminalized, inter alia, "common night walkers" or "habitual wanderer[s]" and persons "habitually living without visible means of support"); *Kolender v. Lawson*, 461 U.S. 352, 361 (1983) (invalidating a stop-and-identify statute as unconstitutionally vague "because it encourage[d] arbitrary enforcement by failing to describe with sufficient particularity what a suspect must do in order to satisfy the statute"). Given the Supreme Court's well-established jurisprudence limiting an officer's discretion to act pursuant to an established vagrancy or vagrancy-related law, it follows *a fortiori* that an unwritten custom—which would provide even vaguer standards and grant greater discretion—is necessarily unreasonable as a matter of law. When combined with this principle, it is even more apparent that the clearly one-sided balancing of interests served as clear and obvious notice to any reasonable officer in Deputy Fleming's position that seizing Simpson and driving him to the county line violated Simpson's Fourth Amendment rights. *See Hope*, 536 U.S. at 741.

**\* \* \***

Under the facts the district court found genuinely disputed, which we must accept for purposes of this appeal of a denial of qualified immunity, Deputy Fleming's conduct clearly and obviously violated Simpson's Fourth Amendment rights. Accordingly, I would affirm the district court's denial of summary judgment on Plaintiffs' Fourth Amendment claim.