**REVISED March 27, 2020**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

January 10, 2020

Lyle W. Cayce
Clerk

No. 19-10202

BRUCE JOINER,

       Plaintiff - Appellant

v.

UNITED STATES OF AMERICA,

       Defendant - Appellee

Appeal from the United States District Court
for the Northern District of Texas

Before WIENER, HIGGINSON, and HO, Circuit Judges.

JAMES C. HO, Circuit Judge:

We withdraw the court's prior opinion of January 10, 2020 and substitute the following opinion.

The district court dismissed this case for lack of subject matter jurisdiction under the Federal Tort Claims Act and the Anti-Terrorism Act. It also precluded additional discovery. We affirm.

I.

On May 3, 2015, Bruce Joiner was on duty as a security guard for the "First Annual Muhammed Art Exhibit and Contest" in Garland, Texas. That

No. 19-10202

day, a pair of Islamic terrorists—Elton Simpson and Nadir Soofi—attacked the event site and shot Joiner in the leg.

Both Simpson and Soofi were subjects of an ongoing FBI investigation at the time of the shooting. As early as 2007, Simpson, an Arizona citizen, was flagged for potential terrorist sympathies. By 2010, Simpson became friendly with Soofi, a fellow mosque member. Around this time, Soofi attempted to purchase a handgun from the Lone Wolf Trading Company in Arizona. The Lone Wolf store was part of the Bureau of Alcohol, Tobacco and Firearms' "Fast and Furious" gunwalking operation, where federal agents would sell firearms to unauthorized buyers in hopes of tracing them back to the Mexican cartel. A background check identified Soofi as possibly being ineligible to purchase a firearm, and a seven-day hold was initially placed on the sale. It was lifted after twenty-four hours, at which point Soofi bought the gun.

On January 7, 2015, terrorists affiliated with al-Qaeda attacked the Paris offices of *Charlie Hebdo* in retaliation for the magazine's publication of cartoons depicting the prophet Muhammad. Ten days later, an Islamic group held a conference at the Curtis Culwell Center in Garland, Texas, called "Stand with the Prophet in Honor and Respect." The conference featured criticism of those who published likenesses of Muhammad. In response, another organization planned a "Draw the Prophet" event, also to be held in Garland.

Simpson denounced the "Draw the Prophet" event in a Twitter exchange with Mohamed Abdullahi Hassan, an ISIS leader in Somalia. Simpson tweeted, "When will they ever learn," and Hassan responded, "The brothers from the Charlie Hebdo attack did their part. It's time for brothers in the #US to do their part."

At this point, Erick Jamal Hendricks, a South Carolina man, contacted Simpson via Twitter. Hendricks had been working to establish an ISIS cell in the United States and was being investigated by and in communication with

No. 19-10202

an undercover FBI agent known as UCE-1.  UCE-1 initially contacted Hendricks on social media, posing as a Muslim interested in joining ISIS.  After vetting UCE-1, Hendricks asked for his help recruiting members for a domestic terror group.  UCE-1 contacted Simpson on April 23, 2015, at Hendricks' instruction.  The next day, Simpson and UCE-1 had the following conversation over social media:

> UCE-1: Tear up Texas.
> Simpson: Bro, u don't have to say that . . . U know what happened in Paris . . . I think . . . Yes or no . . . ?
> UCE-1: Right.
> Simpson: So that goes without saying . . . No need to be direct.

UCE-1 remained in communication with Hendricks about the upcoming Garland event.  Hendricks explained that he was on the no-fly list and could not travel to Texas.  UCE-1 volunteered to go instead.  Hendricks told UCE-1, "You can link with him [Simpson] brother.  That's your call."

On May 3, UCE-1 traveled to Garland where the "Draw the Prophet" event was taking place.  UCE-1 drove his own car and Simpson and Soofi followed in another vehicle. UCE-1 communicated with Hendricks in real time, informing him that he was in the vicinity and implying he was armed.  Hendricks asked a variety of questions about the security setup at the site.  As the two cars approached a police barricade at the rear entrance to the event, UCE-1 took a photograph of the area on his cell phone.  Two security officers, including Joiner, were visible in the background.

Simpson's car pulled up to the barricade.  Simpson and Soofi jumped out and began shooting, hitting Joiner in the leg.

Joiner filed suit against the United States under the Federal Tort Claims Act ("FTCA") and the Anti-Terrorism Act ("ATA"), for assault and international terrorism, respectively.  The government moved to dismiss under Federal Rule of Civil Procedure 12(b)(1), stating that the FTCA claim was

No. 19-10202

barred by the discretionary function exception and that there was no waiver of sovereign immunity on the ATA claim. The district court granted the motion and concluded that Joiner was not entitled to further discovery.

## II.

Sovereign immunity implicates a federal court's subject matter jurisdiction and is subject to de novo review. *Tsolmon v. United States*, 841 F.3d 378, 382 (5th Cir. 2016). In assessing whether there is jurisdiction, courts may consider: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Id.*

Discovery decisions are reviewed for abuse of discretion. *Grogan v. Kumar*, 873 F.3d 273, 280 (5th Cir. 2017).

## III.

The FTCA provides a limited waiver of sovereign immunity for certain tortious government conduct. 28 U.S.C. § 1346. However, if the suit implicates "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused"—the so-called "discretionary function" exception—sovereign immunity is retained. 28 U.S.C. § 2680(a). The discretionary function exception "prevent[s] 'judicial second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984). As the district court correctly noted, "[a]t the pleading stage, the plaintiff has the burden to 'invoke the court's jurisdiction by alleging a claim that is facially outside of the discretionary function exception.'" *Gibson v. United States*, 809 F.3d 807, 811 n.1 (5th Cir. 2016) (quoting *Freeman v. United States*, 556 F.3d 326, 334 (5th Cir. 2009)). Thus, Joiner carries the

burden of establishing that the discretionary function exception does not apply at this stage in the proceedings.

The parties dispute whether exceptions to the FTCA should be construed in favor of the sovereign or in favor of the plaintiff. The district court "strictly construe[d] . . . waivers [of sovereign immunity], resolving all ambiguities in favor of the sovereign." As a general matter, the district court is certainly correct. *See Lane v. Pena*, 518 U.S. 187, 195 (1996) (noting the "established practice of construing waivers of sovereign immunity narrowly in favor of the sovereign"). But "unduly generous interpretations of the exceptions [to the FTCA] run the risk of defeating the central purpose" of the FTCA, making application of this general rule improper in this context. *Dolan v. United States Postal Serv.*, 546 U.S. 481, 491–92 (2006) (quoting *Kosak v. United States*, 465 U.S. 848, 853 n.9 (1984)). Instead, our objective when construing an exception to the FTCA "is to identify 'those circumstances which are within the words and reason of the exception'—no less and no more." *Kosak*, 465 U.S. at 853 n.9 (quoting *Dalehite v. United States*, 346 U.S. 15, 31 (1953)). Therefore, the district court erred in stating the standard for construing exceptions to the FTCA; we do not construe exceptions to the FTCA in favor of any particular party. But as explained below, this error was harmless because Joiner's contentions fail either way.

The discretionary function exception has two parts. First, the court must consider whether the conduct at issue was "discretionary in nature" and involved an "element of judgment or choice." *United States v. Gaubert*, 499 U.S. 315, 322 (1991). If a plaintiff can point to a "specific, nondiscretionary function or duty" that "prescribe[s] a specific course of action for an agency or employee," then there is no discretion. *Freeman*, 556 F.3d at 338. Second, if there is discretion, the court must evaluate whether it is "of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at

322–23 (quoting *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 536 (1988)).  We conclude that the district court correctly declined jurisdiction under this two-step framework.

Under the first step of the analysis under *Gaubert*, we conclude that the plaintiff has failed to identify a nondiscretionary duty violated by an agency or employee of the United States.  For his part, Joiner contends that UCE-1 violated a specific policy: the *Attorney General's Guidelines on FBI Undercover Operations*'s ("AGG-UCO") requirement that, when "an undercover employee learns that persons under investigation intend to commit a violent crime, he or she shall try to discourage the violence," and that an "undercover employee shall be instructed that he or she shall not participate in any act of violence." *Undercover and Sensitive Operations Unit, Attorney General's Guidelines on FBI Undercover Operations* § VI.A.2 (1992).  Joiner further cites the *FBI Domestic Investigations and Operations Guide* ("DIOG"), which states that "certain types of [otherwise illegal activity] cannot be authorized, such as . . . participation in an act of violence." *FBI Domestic Investigations and Operations Guide* § 17.1.  Specifically, Joiner posits that UCE-1 contributed to the violence in Garland by sending the "Tear up Texas" message and by traveling to the event site and communicating with Hendricks about the security setup there, as well as by failing to discourage the violent acts.

The government responds that the AGG-UCO and DIOG do not govern the activities of undercover FBI agents engaged in investigations concerning national security.  The government submitted an affidavit from the FBI's Acting Assistant Director for the Counterterrorism Division stating that the operative policy document for counterterror operations is the *National Security Undercover Operations Policy Implementation Guide* ("NSUCOPG").  The affidavit explains that the NSUCOPG, the bulk of which is classified at "Secret" or above, "functions as a standalone policy, and there is no other FBI

policy that specifically applies" to national security investigations. It affirms that the NSUCOPG "does not contain any provision directing the particular operational manner in which the undercover technique should be carried out." It also notes that the types of activities UCE-1 engaged in are routine, undercover actions.

Even accepting, *arguendo*, that the AGG-UCO and DIOG control the FBI's actions in this case, the government's actions here do not violate any stated policy. To begin with, the AGG-UCO directs agents only to "try to discourage" potential violence. Far from being an explicit command to behave in a certain manner, the language explicitly affords agents latitude in deciding the extent of appropriate action. In other words, the directive retains "an element of judgment or choice"—the basis for the discretionary function exception. *Gaubert*, 499 U.S. at 322. *See also Gonzalez v. United States*, 814 F.3d 1022, 1031–32 (9th Cir. 2016) (holding that a DIOG policy that an "employee must attempt expeditiously to notify other law enforcement agencies" of a threat was "replete with discretionary determinations" and "not the language of 'a specific statutory or regulatory directive'") (quoting *Berkovitz*, 468 U.S. at 542–43).

Nor has Joiner demonstrated that any of the FBI's or UCE-1's actions rise to the level of "participating" in an act of violence. During oral argument, Joiner admitted that his strongest case for the government's involvement in the eventual injury was UCE-1's "communication" with Simpson, Soofi, and Hendricks, providing reconnaissance, and traveling to the site. But such a broad reading of "participation" that encompasses actions that are only remotely related to the ultimate injury is inconsistent with sovereign immunity jurisprudence. We decline to adopt such an expansive interpretation of the term "participation," particularly in light of the Supreme Court's instruction that we must not construe ambiguities in the FTCA context in any

particular party's favor.  *See Kosak*, 465 U.S. at 853 n.9 (*quoting Dalehite v. United States*, 346 U.S. 15, 31 (1953)).  We thus conclude that, even if we were to accept Joiner's proposed framework, the government did not violate any directives prohibiting agents from engaging in acts of violence.

Turning to the second step of the analysis under *Gaubert*, we conclude that the discretion at issue here is precisely the kind that the exception was designed to shield.  An undercover national security operation is a textbook example of discretionary action that Congress meant to insulate from judicial second-guessing.  *See Tsolmon*, 841 F.3d at 383 (holding that "[d]ecisions on when, where, and how to investigate" are "core examples of discretionary conduct for which the United States maintains its immunity") (quoting *Sutton v. United States*, 819 F.2d 1289, 1294–95 (5th Cir. 1987)); *Buchanan v. United States*, 915 F.2d 969, 972 (5th Cir. 1990) ("We do not believe that Congress meant for judges, through hindsight, to second-guess such difficult decisions" like when volatility and potential violence are at issue); *see also Tiffany v. United States*, 931 F.2d 271, 277 (4th Cir. 1991) ("Of the legion of governmental endeavors, perhaps the most clearly marked for judicial deference are provisions for national security and defense.").  The discretionary function exception thus applies.

Joiner's remaining arguments are likewise unavailing.  For example, he contends that the Fast and Furious gun sale contravened the FBI's express policy prohibiting the sale of firearms to suspected terrorists.  The district court disagreed, detailing instances of the agency's discretion and ultimately concluding that the agency did not violate a policy or a statute.  On appeal, Joiner recites the facts relating to the gunwalking operation but does not tie those facts back to the discretionary function exception.  The argument is inadequately briefed and thus waived.  *See McIntosh v. Partridge*, 540 F.3d 315, 325 n.12 (5th Cir. 2008).

No. 19-10202

He also claims that the discretionary function exception is not applicable in this instance because the "law enforcement proviso" effectively overrides it. The FTCA does waive sovereign immunity for certain tortious acts stemming from "acts or omissions of investigative or law enforcement officers of the United States Government"—presumably like UCE-1.  28 U.S.C. § 2680(h). But the law enforcement proviso is mentioned only in passing in Joiner's complaint, and without any reference or connection to the discretionary function exception.

And for good reason—the argument is unavailing.  This court, along with the Second, Fourth, Seventh, Ninth, and D.C. Circuits, has held that the law enforcement proviso does not negate the discretionary function exception.  *See Campos v. United States*, 888 F.3d 724, 731 (5th Cir. 2018) ("[B]oth the proviso and the discretionary function exception must be read together.  In other words, one does not moot the other when both cover a fact pattern.") (internal citation omitted); *see also Linder v. United States*, 937 F.3d 1087, 1089 (7th Cir. 2019); *Medina v. United States*, 259 F.3d 220, 224–26 (4th Cir. 2001); *Gasho v. United States*, 39 F.3d 1420, 1434–35 (9th Cir. 1994); *Gray v. Bell*, 712 F.2d 490, 507–08 (D.C. Cir. 1983); *Caban v. United States*, 671 F.2d 1230, 1234 (2d Cir. 1982); *but see Nguyen v. United States*, 556 F.3d 1244, (11th Cir. 2009).  So even if Joiner invoked the law enforcement proviso here, that does not automatically trump the discretionary function exception—and he has not demonstrated why it should trump the discretionary function exception here.

In sum, Joiner has not established that the discretionary function exception does not apply under the FTCA.  Accordingly, sovereign immunity has not been waived.

IV.

Appellant also challenges the district court's decision not to recognize the state-created danger doctrine, which theorizes that the government may be

liable for tortious conduct "if the state actor created or knew of a dangerous situation and affirmatively placed the plaintiff in that situation." *Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 864 (5th Cir. 2012) (en banc). Joiner asserts that the FBI, and UCE-1's actions, contributed to endangering lives and led to his injury. He does not argue that the state-created danger doctrine provides an independent basis for liability under the FTCA. Instead, the claim is that the doctrine is a limitation on the discretionary function exception—namely that the government never has the discretion to imperil its citizens or commit acts of violence against them.

We have repeatedly declined to recognize the state-created danger doctrine in this circuit. *See, e.g., Cook v. Hopkins*, No. 19-10217, 2019 WL5866683, at *5 (5th Cir. Nov. 8, 2019) (per curiam); *Estate of C.A. v. Castro*, 547 F. App'x. 621, 626 (5th Cir. 2013) (per curiam); *Whitley v. Hanna*, 726 F.3d 631, 639 n.5 (5th Cir. 2013); *Doe*, 675 F.3d at 866; *Beltran v. City of El Paso*, 367 F.3d 299, 307 (5th Cir. 2004). Joiner has been unable to point to a single case where a plaintiff has used the state-created danger doctrine to overcome the FTCA's discretionary function exception. Instead, the doctrine, where applicable, generally permits a plaintiff to proceed on a claim when sovereign immunity is *already* waived, as in suits under 28 U.S.C. § 1983. We thus decline to forge new circuit precedent and adopt the state-created danger doctrine in such uncharted territory.

## V.

Joiner also appeals the district court's dismissal of the case for lack of subject matter jurisdiction under the Anti-Terrorism Act. The ATA states that "[n]o action shall be maintained" against "the United States, an agency of the United States, or an officer or employee of the United States" from injury arising from international terrorism. 18 U.S.C. § 2337. Joiner argues that the Geneva Convention's prohibition of a signatory's "absolv[ing] itself . . . of any

No. 19-10202

liability incurred by itself . . . in respect of breaches" functions as customary international law and waives sovereign immunity.  But a waiver of sovereign immunity "cannot be implied but must be unequivocally expressed." *United States v. King*, 395 U.S. 1, 4 (1969).  Congress has explicitly stated that sovereign immunity shall *not* be waived for injuries related to terrorist incidents.  The district court properly dismissed the ATA claims for lack of subject matter jurisdiction.

## VI.

Lastly, Joiner challenges the district court's ruling that discovery was unlikely to overcome the discretionary function exception.  Plaintiffs bear the burden of demonstrating the necessity of discovery.  *See Davila v. United States*, 713 F.3d 248, 264 (5th Cir. 2013); *Freeman*, 556 F.3d at 341–42.  A plaintiff is "not entitled to jurisdictional discovery if the record shows that the requested discovery is not likely to produce the facts needed to withstand a Rule 12(b)(1) motion." *Freeman,* 556 F.3d at 342.  That burden is even greater when "the party seeking discovery is attempting to disprove the applicability of an immunity-derived bar to suit because immunity is intended to shield the defendant from the burdens of defending the suit, including the burdens of discovery." *Id.*  Joiner offers only conjecture as to how the government's interactions with Simpson and Soofi led to his injury, speculating that the government may have aided in procuring weapons or provided additional communications with the terrorists on the day of the shooting.  These recitations are insufficient to establish that further discovery will overcome the discretionary function exception and defeat sovereign immunity.  The district court did not abuse its discretion by barring additional discovery.

\* \* \*

For the foregoing reasons, we affirm.

11